UNITED STATES of America,

v.

Paul G. EINSTMAN, Defendant.

No. 04 CR.97(CM).

United States District Court, S.D. New York.

July 14, 2004.

374

---

Douglas Michael Tween, U.S. Department of Justice, Antitrust Division, New York City, for Plaintiff.

Clinton W. Calhoun, III, Briccetti, Calhoun & Lawrence, LLP, White Plains, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

McMAHON, District Judge.

Defendant stands before the Court convicted of one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371. In brief, defendant and another individual, Leonard Weiss, entered into an agreement to defraud Einstman's employer. Weiss was a supplier to the employer; Einstman, who was in charge of purchasing, approved dummy or inflated invoices for Weiss' products. The two men split the resulting overcharges. The total amount of the fraud perpetrated against Einstman's employer was $240,000. Einstman personally received one-half of that amount.

There was no plea agreement; the Government prepared a Pimentel letter, and Probation concurred with its proposed USSG calculations. At a total offense level of 17 and a Criminal History category of I, Probation recommended a sentence of incarceration at the low end of the Guidelines range of 24–30 months. The Guidelines calculation began from a base offense level of six, which is the base offense level assigned to all convictions for fraud pursuant to USSG § 2B1.1(a), and enhanced that base offense level by the following factors: 12 levels because the loss (as calculated by the Government and Probation) was $240,000, and two levels because the defendant abused a position of trust, pursuant to § 3B1.3. The offense level was reduced by three levels due to defendant's timely acceptance of responsibility, pursuant to § 3E1.1(a) and (b). The defendant had no prior convictions, although the conspiracy of which he stands convicted spanned a period of four years, which means the defendant has been immersed in criminal activity for over 10% of his 38 year life.

The amount of the loss was admitted by the defendant in his plea allocution (Tr. 28–29) and defendant does not contest it. The abuse of trust enhancement was not specifically admitted by the defendant at his plea allocution, and defendant contests its applicability. Per 18 U.S.C. § 3663, the Court is required to order restitution in this case.

Einstman argues that the United States Sentencing Guidelines must be found to be unconstitutional following the United States Supreme Court's decision in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Blakely requires that any fact that increases a sentence beyond the "relevant statutory maximum" (defined by a five-member majority of the Supreme Court as the maximum sentence a judge may impose without making any additional findings of fact) must be

proved to a jury beyond a reasonable doubt, unless the defendant waives his Sixth Amendment rights in this regard. Einstman also argues that any order of restitution is also subject to *Blakely*. The Government demurs as to both issues.

This Court has already sentenced several defendants post-*Blakely*, and I am on record as concluding that the USSG are unconstitutional, adopting the reasoning set forth by The Hon. Paul Cassell in *United States v. Croxford*, 2004 WL 1462111 (D.Utah, June 29, 2004). *See* transcripts in *United States v. Roamy Fils-Aime*, 03 Cr. 1145 (July 14, 2004); *United States v. John Mikelenich*, 03 Cr. 950 (July 8, 2004). On the day before Einstman's sentencing, however, I received a brief from the Government, fulsomely setting forth its position on the *Blakely* issue. That position is that (1) the USSG are in fact constitutional; (2) even if they are not, this Court and other lower federal courts are required to continue to apply them until the United States Supreme Court—which had previously considered the USSG to be constitutional, *see United States v. Mistretta*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)—reverses field and expressly declares them unconstitutional; and (3) in the event I cannot concur with either point one or point two, then the Guidelines must be deemed unconstitutional in their entirety, because those aspects of the Guidelines that are constitutional cannot be severed from those aspect that are unconstitutional.

I write to comment on the Government's arguments

### Point (1)—The Constitutionality of the USSG.

As to point one, I continue to believe—along, apparently, with several member of the United States Supreme Court, as well as a number of my brothers and sisters in various district courts—that the necessary implication of *Blakely* is that the USSG as they currently exist must be unconstitutional. I applaud the Government's effort to salvage the Guidelines by noting that the Commission-promulgated Federal Guidelines operate differently from Washington State's legislatively-enacted guidelines, but I find it too clever by half. In fact, there is very little difference between the two systems, and what difference there is does not bode well for the constitutionality of the USSG.

In *Blakely*, the Washington State Criminal Code set two different statutory maximum sentences for the crime of which defendant stood convicted—ten years for a Class B felony and 53 months for the specific Class B felony to which Blakely pled: second degree kidnapping involving domestic violence and use of a firearm.[1] The latter "maximum" is actually described by the Washington State Legislature as a "presumptive sentencing range," and the statute authorized the sentencing judge to impose a longer sentence if he found "substantial and compelling reasons justifying an exceptional sentence," based on any relevant factors not taken into account in setting the presumptive range. Some but not all of these factors are listed in the statute. The judge in *Blakely*, after holding a hearing, found that the defendant had committed the crime with deliberate cruelty and imposed an extraordi-

---

**1.** To be quite precise, defendant pleaded guilty to kidnapping in the second degree while armed with a deadly weapon, in violation of Wash. Rev.Code § 9.94A.125. He took an Alford plea to the indictment and did not allocute, but fact that the fact that the victim was the defendant's wife was pleaded in the indictment. Her status as his wife made the crime a crime of domestic violence under Wash. Rev.Code § 10.99.020(3)(b). See Petitioner's Br. in *BLAKELY v. WASHINGTON*, 2003 WL 22970606, at *6 n. 3 (2003).

nary sentence of 90 months. Obviously, 90 months is less than 10 years. However, after *Blakely* it is clear that 53 months is the "relevant statutory maximum" for the defendant's crime, and not merely a "presumptive" sentence. Indeed, that is the essential change that *Blakely* worked in the law; the Supreme Court majority ruled that the "... relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." In Blakely's case the domestic violence and use of a gun were statutory elements that determined the presumptive range, but the deliberate cruelty was the product of an additional judicial fact-finding.

Under federal law, Congress has set statutory maxima, not for classes of crimes, but for the crimes themselves. Thus, conspiracy to commit mail fraud carries a statutory maximum sentence of 5 years' imprisonment and 3 years' supervised release, plus a fine capped at $250,000 or twice the amount of gain to the defendant or loss to the victim, and restitution to the victim (about which more later). Congress then delegated to a body it created, the United States Sentencing Commission, the authority to identify those factors that a judge must take into account in setting a sentence, to weigh how relevant each such factor should be in a sentencing decision, and to assign point values to those factors. Under this scheme, a sentencing judge's conclusion that a particular factor exists results in a certain number of points (or levels), which in turn places the defendant on the vertical axis of a sentencing grid. The horizontal axis evaluates the defendant's recidivism. The intersection point on the grid identifies what has become known as the "guideline" sentence. The guideline sentence is the defendant's "presumptive" sentence under the federal sentencing scheme.

Under both the federal and state sentencing schemes, "presumptive" means just that—the sentence is not automatic; the presumption can be overcome. Unlike a Washington State judge, a federal judge can depart either up or down from the presumptive sentence, although we are not supposed to do that with any great frequency, lest we incur the wrath of Congress by refusing to allow the USSG to "fetter the discretion of sentencing judges." *Mistretta, supra,* 488 U.S. at 396, 109 S.Ct. 647. Departure, in other words, is supposed to be an extraordinary, not an ordinary, event. That would appear to correspond to Washington State's mandate that judges mete out an "extraordinary" sentence (one that is higher than the presumptive sentence) only when they can articulate "substantial and compelling reasons" for so doing. Washington State judges, however, are free to consider any number of factors in making such a finding, including factors that are not listed in the authorizing statute. Federal judges, by contrast, are forbidden to consider a long list of factors that historically factored into sentencing decisions when they determine the propriety of an upward or downward departure, and may depart from the guideline range only when some factor or combination of factors takes the defendant's situation "outside the heartland" of the guidelines.

The Government's principal rationale for why the federal system differs from Washington State's—that the two systems operate differently—is not persuasive. In fact, it flies in the face of the obvious, since the similarities between the USSG and Washington's Criminal Code are striking. Both systems have two levels of "maximum" sentence (the top of the guideline or presumptive range and the absolute, inviolable ceiling beyond which no sentence can ever stray); both calculate the guideline/presumptive range by taking into account fac-

tors that everyone would agree enhance the seriousness of the underlying crime; both allow judges to enhance the sentence above the guideline-presumptive maximum (but never above the absolute, inviolable ceiling) based on facts that are neither admitted by the defendant nor proved beyond a reasonable doubt.

There is one critical difference between the sentencing systems, and in thinking about the constitutionality of the federal guidelines it is important to articulate exactly what that difference is. To compare apples and apples, I will contrast Blakely's situation with that of a hypothetical federal defendant who has pled guilty to interstate kidnapping of his beaten and traumatized ex-wife, a crime in which he brandished a gun.

As noted above, Blakely's presumptive 49–53 month sentence under Washington State's system was derived by taking into account both the underlying offense (kidnapping) and several factors that defined his crime as particularly heinous (domestic violence and using a firearm). In other words, Blakely's pled to a kidnapping with a particular level of severity. That, without more, subjected him to a 49–53 month "presumptive" sentence. Under the statute, that sentence could be increased, in the discretion·of the sentencing judge, up to (but not above) ten years (the real statutory maximum), based on any factor or combination of factors that in the judge's opinion made the case for a greater sentence "substantial and compelling." Absent that, the judge was bound to sentence within the "presumptive" range. It was increasing Blakely's sentence through application of a factor that the sentencing judge deemed substantial and compelling (acting with deliberate cruelty)—but that the defendant had not admitted, and that no jury had found beyond a reasonable doubt—that the Supreme Court found unconstitutional.

The federal kidnapping statute (18 U.S.C. § 1201) carries a maximum sentence of life imprisonment, with a variable mandatory minimum, from none (other than some term of imprisonment) to twenty years, based on certain characteristics of the victim. An ex-wife is not a victim whose kidnapping carries any special mandatory minimum, so for our hypothetical defendant the statutory range set out in the Title 18 is literally "a term of years to life"—as broad as a range can be. Nevertheless, under the USSG, every kidnapping carries a "base offense" level of 32, which means that a defendant with no prior criminal record, who is convicted of interstate kidnapping, whose victim is not part of a specially designated class of victims, automatically finds himself at a Guidelines range of 121–151 months—or, put otherwise, the "least heinous" kidnapping by the "least heinous" kidnapper carries a presumptive ten year minimum sentence. The range can be increased to create a higher "presumptive" sentence (the USSG sentence) if the district judge makes findings, by a preponderance of the evidence, on various enhancing issues that reflect the severity of the underlying kidnapping. Those issues include use of a weapon (2 extra points, *see* USSG § 2A4.1(3)) and commission of the crime in the context of committing some other crime, which could of course include some act of domestic violence (a varying number of points depending on circumstances that need not be discussed in detail here, *see* USSG § 2A4.1(7)).

So the federal system differs from the one condemned as violative of the Sixth Amendment in *Blakely* in only one significant way. Two critical factors—domestic violence and use of a gun—weigh heavily in the setting of the "presumptive" or "Guideline" sentence under both schemes. But those factors are written into Washington law, and thus were necessarily admitted by Blakely when he took his plea.

They are wholly non-statutory under federal law, and so are not necessarily admitted by our hypothetical federal defendant when he pleads to a violation of 18 U.S.C. § 1201. The use of a gun and the domestic violence would instead factor into the defendant's federal sentence only if they were found by a district judge under a preponderance of the evidence standard, at a proceeding conducted long after conviction. Frankly, that difference renders the federal system more vulnerable to attack on Sixth Amendment grounds, not less.

The Government's other argument is that there is some presumed distinction between legislatively-enacted guidelines and those promulgated by the United States Sentencing Commission, which the Government analogizes to rule-making by a regulatory agency. I find this distinction no more compelling. As the Seventh Circuit held last week in *United States v. Booker*, 375 F.3d 508 (7th Cir.2004), the fact that the USSG are promulgated by a legislatively-created Sentencing Commission instead of directly by the legislature should have no effect on the constitutionality of the Federal guidelines. The Sentencing Guidelines may be no more than "sentencing rules" that are "binding on sentencing courts by statute," (*see* Govt' Br. at 13), but that description equally fits the sentencing law adopted by the Washington State Legislature. By having the Legislature create the grid, instead of having the Legislature create the Commission that creates the grid, all Washington did was eliminate the middle man. Clearly, it is not enough for a legislature (as opposed to a commission) to authorize judicial fact-finding, because the Washington State Legislature authorized the judicial fact-finding that was stricken in *Blakely*. Calling something a "presumptive" sentence rather than a "guideline" sentence is certainly not a difference that makes a difference. And a criminal defendant's Sixth Amendment rights are surely no greater

under the laws of the several States than under the laws of the United States.

As Judge Posner articulated in *Booker*, a district judge's findings on various enhancing factors (which we are required by law to make) "largely determine the sentence" within "a narrow band" under the USSG system, *see Booker*, at 510–512, 2004 WL 1535858, at *2–*3. Since *Blakely* condemns judicial fact-finding that enhances a base offense sentence, I am hard pressed to see how the Legislature/Commission distinction makes any difference at all to the constitutionality of the Guidelines. And this is all without regard to Justice Scalia's observation in *Mistretta* that the Guidelines are, in effect, laws and not simply rules—an observation that gains force when one considers that Congress has taken an ever-increasing role in setting sentencing guidelines and constraining judicial discretion in recent years.

**Point 2: The Need to Await Definitive Supreme Court Action**

As to point 2: I have read the Seventh Circuit's majority opinion in *Booker*, Judge Easterbrook's spirited dissent in that case, and the Fifth Circuit's opinion in *United States v. Pineiro*, 377 F.3d 464, 2004 WL 1543170 (5th Cir.2004), as well as the Government's *Blakely* brief. I, like Judge Posner, conclude that we should not simply adhere to the Guidelines system until the Supreme Court clarifies its position on the USSG. I cannot improve on Judge Posner's articulation of the fallacy in the Government's insistence that lower courts must pretend that *Blakely* never happened and blindly follow *Mistretta* and its progeny—precedents of whose constitutionality my own Circuit Court of Appeals is obviously mistrustful, *see United States v. Penaranda*, 375 F.3d 238 (2d Cir.2004)(certifying questions concerning the constitutionality of the USSG after *Blakely* to the United States Supreme

Court). I therefore adopt his reasoning as my own on this issue. I take the liberty, however, of adding a word from the perspective of a district judge.

Sentencing policy is a matter of considerable debate among politicians, journalists, academics and judges. For almost all of the participants in that debate, the issues are abstract. Even appellate judges are insulated from the reality of sentencing determinations; they decide cases on the basis of lawyerly argument, and rarely encounter the people who are the subject of their decisions.

For district judges, however, sentencing is anything but an academic exercise. We have to look a human being in the eye and pronounce his fate, while his counsel endeavors to deflect or minimize the anticipated blow, and his spouse and children or distraught parents and friends weep in the gallery. It is—and it ought to be—a fraught moment. I know of no judge who takes it lightly.

■ When a seismic pronouncement like *Blakely* shakes the foundations of what appeared to be a settled legal landscape, real people, like Paul Einstman, seize upon it. Those real people have real constitutional rights. To ask that the judges who are constrained to sentence those real people ignore what appear to be the inescapable constitutional consequences of a decision of the United States Supreme Court until that Court addresses it directly is, frankly, to ask too much. This is the more true when we consider, as the Fifth Circuit noted in *Pineiro*, that the binding force of a Supreme Court decision is ordinarily not limited to the particular set of facts that produced it. The binding force of a determination that the Sixth Amendment forecloses judicial determination, under a preponderance of the evidence standard, of facts that enhance a sentence beyond a "relevant statutory minimum," is not perforce limited to sentences

imposed under the laws of the State of Washington. Nor is it limited to sentencing schemes in which the "relevant statutory minimum" is set by a legislature rather than by a Commission that, while nominally part of the Judicial Branch, is now, by Congressional decree, made up primarily of non-judges (and which need not include any judges at all!). The Supreme Court's refusal to express any view on whether the Sixth Amendment issues discussed in *Blakely* invalidated the USSG meant only that the USSG were not at issue in the specific case before it. Unfortunately, the USSG are at issue in literally thousands of cases already pending or soon to be pending in the lower federal courts. And prior Supreme Court precedents addressing the USSG—notably *Mistretta*—simply did not discuss the issue that underlies *Blakely* (as the Fifth Circuit also observed in *Pineiro*).

Perhaps the Supreme Court assumed that the lower federal court judges (and I include Court of Appeals judges in this) would hold fast to the Guidelines pending some definitive pronouncement from on high, sweeping away those defendants' *Blakely*-based constitutional arguments in reliance on a brief dictum in *State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)—a decision in a civil case that involved no constitutional issue, let alone the rights of a criminal defendant. Frankly, I doubt that the highest court in the land harbored such an expectation, even if the only risk we ran by such a course of conduct was a lot of extra work down the line, in the event that five Supreme Court justices ultimately decided the USSG were unconstitutional.

But that is not all we risk. We also risk the ultimate fate of countless defendants whose convictions and sentences will inevitably be finalized while this issue percolates through the usual channels—defendants who may not have an opportunity to

assert latterly-found Sixth Amendment rights because new pronouncements of law are not retroactive for defendants whose convictions are final. *Teague v. Lane,* 490 U.S. 1031, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989); *Schriro v. Summerlin,* —— U.S. ——, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Such considerations weigh heavily in favor of our not rebuffing what appear to many of us to be legitimate constitutional arguments against the USSG—especially on the basis of a technical pronouncement that appears to have little or nothing to do with the situation in which we find ourselves.

Most if not all lower court judges would have preferred to have the Supreme Court—having mustered a majority for Justice Scalia's views in *Blakely*—hold that decision until is could locate a vehicle for considering the same issues in the federal context. That way, we would have obtained the guidance we need to keep the criminal justice system functioning in a rational way. No one is happy that every one of us is turning in his own way. But we can only do what seems best to each of us, while hoping that the Supreme Court will address this issue immediately—fortunately, there is already a conflict between Circuits on the question—and in an expedited manner.

### Point 3: Severability

This brings me to the Government's third point. After *Blakely*, it would appear that I cannot do what I am supposed to do in terms of sentencing this defendant, because I cannot constitutionally make a finding concerning a specific two level enhancement that has been recommended to me by Probation—namely, whether defendant abused a position of trust in connection with the crime. The question then becomes whether I can hand down a USSG sentence at all.

I agree wholeheartedly with the Government's position that the USSG are not severable, so the unconstitutionality of the provisions concerning the judicial fact-finding of sentencing enhancements necessarily means that the entire USSG scheme falls. The Government's analysis of this point, under *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 191, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999), seems beyond cavil. Recent Congressional actions in connection with the USSG underscore that "... the Legislature would not have 'enacted those provisions which are within its power, independent of that which is not," *Champlin Refining Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932), had Congress known that it was unconstitutional for judges to make the explicit factual findings that play, in highly regimented and specific ways, into a "narrow band" of highly constraining, if not totally non-discretionary, sentencing options. In particular, it seems evident in this day and age of Enron and Sarbanes–Oxley that Congress would never have countenanced a Guidelines system in which all first-time offenders who pled guilty to the elements of wire, mail or bank fraud, and nothing more, were limited to a sentence of 0–6 months—the base offense for all fraud convictions—without regard to the amount of the fraud, its sophistication, or the role played by the defendant in the conspiracy. Such sentences make a mockery of the real (not "relevant") statutory maxima that have been set by the Legislative Branch, and effectively eviscerate Congress's expressed intention that, to use this case as an example, a schemer who defrauds his employer be eligible for as much as five years in prison.[2]

2. Furthermore, this Court has already encountered a case—a felon-in-possession case

The result—the return to indeterminate sentencing, in which judges are free to consider all relevant factors and to sentence the defendant anywhere between the statutory minimum (if there be one) and the statutory maximum [3]—should not be seen as a negative. I seriously doubt that today's district judges will fail to consult the Guidelines, or fail to be guided by them in most cases, simply because those provision are now in fact *guidelines* rather than *mandates*. After all, most of us have operated for all or a significant portion of our careers on the bench under the USSG system. There is far too much wisdom in the Guidelines, practical as well as theoretical, for any sensible jurist to ignore them. At the same time, I imagine that most of us will take our sentencing responsibility even more seriously than we did before, expending additional time and effort in the quest to craft sentences that are truly just, after careful consideration of how much to weigh all relevant factors. And I imagine that among those factors will be Congress' expressed desire to see criminals adequately punished for their transgressions.

■ Einstman has admitted to the amount of the loss, which is the major factor in the USSG calculation of his sentence. But he does object to any further enhancement for abuse of trust—a position with which I do not agree. That being the case, I agree with the Government that it would be inappropriate for me to give the defendant the benefit of a "one way street" application of the USSG. *United States v.*

*Croxford,* 324 F.Supp.2d 1230, 1244, 2004 WL 1521560 at *12 (D.Utah 2004). Application of the federal sentencing guidelines to Einstman is unconstitutional, and given the integrity of the total sentencing scheme put into place by Congress, there is simply no saving it in part to a defendant's benefit.

■ Paul Einstman's sentence will be determined, after briefing and argument by counsel, on the basis of his criminality, taking into account his role in the offense, the nature and amount of the fraud perpetrated, the identity of the victim and defendant's relationship to that victim, and the sentences of his co-conspirator, as well as his personal circumstances. In particular, I will take into account the fact that he was entrusted by his employer with the purchasing function and that he abused that trust by feathering his own nest at his employer's expense over a period of almost four years. Although, in a non-USSG context, cases like *United States v. Allen,* 201 F.3d 163 (2d Cir.2000) no longer have the same relevance, I note that the Second Circuit recognizes that it is the "extent to which the position provides the freedom to commit a difficult-to-detect wrong" that is the hallmark of the employee who abuses a position of trust. Einstman occupied such a position. According to his employer, Einstman was responsible for spending upwards of $1 million a year on behalf of his employer, for selecting and contracting with vendors, negotiating prices, checking the accuracy of invoices and ensuring that

in which the defendant pled guilty to a violation of 18 U.S.C. § 922—in which the base offense level was set with regard to a fact that is not an element of the underlying offense (the type of firearm involved, see USSG § 2K2.1(3)). At his plea allocution the defendant did not specifically allocute to the types of guns he possessed. So even imposing a sentence at the base offense level under the existing guidelines may not pass constitutional muster in all cases—which means that, in

at least some cases, there is literally nothing left of the USSG.

3. Earlier today, the Sixth Circuit, in *United States v. Montgomery,* 2004 Fed.App. 0226(p), deemed that the guidelines were nothing more than guidelines (i.e. are not mandatory) and directed district judges in that Circuit to revert to indeterminate sentencing in all cases.

382

all supplies ordered were in fact received. The fact that Einstman was in charge of purchasing, and his every move was not supervised on a day-to-day basis, means that he was freer to abuse the powers of his position. Moreover, he has been described by his employer as "diligent, punctual and reliable" (PSR at ¶ 55); precisely because he was so viewed, he was trusted and his criminal activity harder to discover. Einstman was a faithless servant, and to me that always makes a very significant difference.

### Restitution

█ Defendant argues that restitution ought not be imposed because he is constitutionally entitled to have a jury find the amount of restitution beyond a reasonable doubt. I disagree.

In recent years, several Circuit Courts of Appeal have concluded that restitution is a civil remedy rather than a criminal punishment, even though it is imposed in the context of a sentence in a criminal proceeding. *See e.g., United States v. Behrman,* 235 F.3d 1049 (7th Cir.2000); *United States v. Bearden,* 274 F.3d 1031 (6th Cir.2001); *United States v. Syme,* 276 F.3d 131 (3d Cir.2001). Unfortunately, the Second Circuit is not among the Courts of Appeal that has spoken on this issue. In the context of determining whether and how an order of restitution may be collaterally attacked, however, the Second Circuit has referred to restitution as "noncustodial *punishment*" and has held that the proper vehicle for mounting a collateral attack on an order of restitution is not habeas corpus but coram nobis or some other extraordinary writ normally available in the criminal context. *Kaminski v. United States,* 339 F.3d 84, 89–91 (2d Cir. 2003). In view of this recent pronouncement, it is not clear to me that the Second Circuit would agree with the cases cited above. And indeed, there is an element of sophistry in stating that something imposed as part of a sentence in a criminal case is in fact not punishment for the crime.

Fortunately, I need not prognosticate. As an alternative rationale, Judge Easterbrook of the Seventh Circuit held persuasively in *Behrman, supra.,* that a judicial finding of the amount of restitution does not violate *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because the statute that mandates an order of restitution in a case like this one, 18 U.S.C. § 3663A, does not have any "statutory maximum" that could be "increased" by a judicial finding of the amount of loss to the victim. Nothing in *Blakely* would appear to alter this result; the restitutionary scheme is not part of the USSG and does not include anything like the "relevant statutory maximum" that was decreed in *Blakely*. It appears that Congress wanted district courts to set the amount of restitution in the old-fashioned, pre-USSG way, just as they would set fines (as to which there are statutory maxima, but no guidelines whatever). I see no constitutional infirmity in that—in the context of fines, it has been done that way throughout the history of the Republic.

The defendant is jointly and severally liable to his employer, with his co-defendant, Leonard Weiss, in the amount of $221,000.

Sentence will be pronounced in accordance with this opinion.